IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA,

      v.

SHERYL HENDERSON

CASE NO.: 2:20-cr-28

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on Defendant's Motion to Suppress. Doc. 65. The Government filed a Response, opposing Defendant's Motion; Defendant filed a Reply. Docs. 73, 85, 96. I conducted a hearing on this Motion on January 25, 2021, at which Defendant, Defendant's counsel, Assistant United States Attorney Joshua Bearden ("AUSA Bearden"), and Sergeant First Class Richard Sikes ("Trooper Sikes") appeared. Following the hearing, the parties submitted supplemental briefing. Docs. 119, 120, 151. After review of the parties' written submissions and oral arguments and consideration of the entire record, I **RECOMMEND** the Court **DENY** Defendant's Motion.

## INTRODUCTION

Defendant has been indicted for possession with intent to use five or more false identification documents, in violation of 18 U.S.C. § 1028(a)(3). Doc. 1. The charges arise from a traffic stop and search that occurred on March 6, 2019, where law enforcement officers found, among other things, several fake IDs and marijuana. Defendant moves to suppress all evidence obtained during the during the search. Defendant argues the stop and search were conducted in violation of the Fourth Amendment. Few, if any, of the facts related to the stop and search are

disputed, given that almost all the relevant events were captured on a dashboard camera video recording, which included audio.

After fully considering the entire record in this matter, I find the officer conducting the stop violated Defendant's constitutional rights by asking questions that ran afoul of <u>Rodriguez v. United States</u>, 575 U.S. 348 (2015), and, as a result, improperly prolonged the stop—albeit for only a short while. Ordinarily, such a violation would result in exclusion of the evidence seized during the stop. But the Government has raised the inevitable-discovery exception as a reason to not exclude the evidence. On the very specific facts of this case, I find the inevitable-discovery exception applies and, therefore, I recommend the Court deny Defendant's Motion to Suppress.

## PROPOSED FINDINGS OF FACT[1]

Defendant's Motion to Suppress relates to a traffic stop and subsequent vehicle search conducted by Georgia State Patrol Trooper Richard Sikes. At the time of the stop, Trooper Sikes was an officer with the Georgia State Patrol's "The Nighthawks" DUI Task Force and had over 16 years of experience in law enforcement. Doc. 108. Trooper Sikes was joined by another more junior Georgia State Trooper, Trooper McCrary, for most of the stop and search.

The traffic stop occurred around 3:30 p.m. on March 6, 2019—a sunny afternoon—in South Georgia. Defendant was driving a four-door sedan, with three passengers, southbound on a state highway headed toward Brunswick, Georgia. Trooper Sikes was driving in the opposite direction at the same time. Trooper Sikes saw Defendant drive past him at 80 to 85 MPH,

---

[1]     I conducted a hearing on Defendant's Motion on January 25, 2021. During the hearing, portions of the dashcam video were played, and I reviewed the entire dashcam video on its own. Trooper Sikes also testified at length about the stop and search at the hearing, and certain documentary exhibits were admitted without objection. The factual recitation here is based on the entire record.

despite the fact the road had a 45 or 55 mile-per-hour speed limit.  Trooper Sikes immediately made a U-turn, turned on his lights and sirens, and began pursuit.

Approximately 45 seconds elapsed from when Trooper Sikes began pursuing Defendant until Defendant was clearly visible on Trooper Sikes' dashcam, at which point Sikes was close behind Defendant's car.  The dashcam shows that once Trooper Sikes was close to Defendant's car, Defendant promptly began to brake, activated her turn signal, and pulled over to the highway's shoulder.  As Trooper Sikes explained in his report: "Once I closed the distance and caught up with the car, the driver pulled to the shoulder of the roadway near the intersection with SR 99."  Doc. 65-2 at 3.

Defendant pulled to a stop on the side of the state highway just before arriving at an intersection with another state route.  The state highway is a wide, four-lane road, with a dedicated turn lane in the middle.  The intersection beyond where the stop occurred is controlled by a traffic light, and two medium-sized gas stations sit on two opposite corners of the intersection.  The state route at the intersection is a two-lane highway with dedicated turn lanes at the point of intersection.  Defendant stopped her car on the right shoulder of the southbound lane a short distance from one of the gas stations at the intersection.  The dashcam video shows vehicles entering and exiting the gas station and an adjacent parking lot in front of Defendant's stopped car.

When Trooper Sikes first stopped behind Defendant's car, he called in the car's tag number over the radio.  Trooper McCrary heard the call and joined Trooper Sikes at the traffic stop.[2]  Trooper McCrary appeared on the dashcam footage about 1 minute and 20 seconds after

---

[2]     At the hearing, Trooper Sikes testified he serves as a mentor to Trooper McCrary.  Some time prior to this incident, Trooper Sikes had informed Trooper McCrary if he (Sikes) ever called in a traffic stop over the radio, it meant "something, based on [his] experience, is happening."

Trooper Sikes pulled Defendant over and about 15 seconds after Trooper Sikes and Defendant began speaking. Doc. 65-1 at 1:15–2:40. After pulling Defendant over, Trooper Sikes exited his patrol car and approached the rear of Defendant's car. He stopped near the rear corner on the driver's side and placed his hand atop the trunk lid. Trooper Sikes testified at the hearing he placed his hand on the trunk lid as a result of his training, explaining physical touch would allow him to detect unusual activity in the trunk or movement inside the car by its occupants. Trooper Sikes detected no activity in the trunk, but testified he observed the occupants of the car moving around and felt their movement while his hand was on the trunk lid. The dashcam video provides a clear view of the back window of Defendant's car, and it does not reflect any unusual movement by the occupants. However, Trooper Sikes had a slightly different vantage point from the dashcam.

Almost immediately after approaching the rear of the car, Trooper Sikes began giving verbal commands. Trooper Sikes first directed Defendant to exit the car. Id. at 2:10. Defendant did not exit the car after the first command given by Trooper Sikes. After the first directive from Trooper Sikes, Defendant began unbuckling her seat belt and accidentally activated her front windshield wipers. About five seconds later, Trooper Sikes gave a second command to exit the car and gestured with his hand for Defendant to exit the car and come speak with him. Id. at 2:15–2:20. Another few seconds passed as Defendant exited the car and met Trooper Sikes by the rear of the car, away from the road, and near the shoulder. When Defendant exited the car, she was wearing pants and a black tank top. Defendant and Trooper Sikes stood close together to speak, without any significant distance between them. Defendant had her license in her hand when she got out and promptly handed it to Trooper Sikes. Trooper Sikes immediately engaged

Defendant and began asking her questions.  Defendant spoke to him without hesitation.  Id. at

2:20.

Trooper Sikes began by asking Defendant where she was headed, and Defendant

explained she was headed to Jacksonville, Florida.  Id. at 2:27.  Next, Trooper Sikes asked her if

she was late; Defendant said no but acknowledged the question was due to her excessive speed.

Id. at 2:28–2:40.  Defendant admitted she was not paying attention to her speed or the speed

limit.  Id. at 2:38.  Defendant and Trooper Sikes continued to discuss how fast she was driving

when Trooper McCrary arrived and positioned himself at the hood of Trooper Sikes' patrol car.

Id. at 2:37–2:42.  Trooper McCrary, who responded when he heard Trooper Sikes' call over the

radio, stood silently, observing Defendant and Trooper Sikes speaking, which was still limited to

questions about Defendant's driving.

After Trooper Sikes informed Defendant of how fast she was traveling—85 MPH in a 55

MPH zone and then 80 MPH in a 45 MPH zone—he asked her more questions about her travel.

Id. at 2:40–3:11.  Trooper Sikes asked Defendant from where she was coming; Defendant said

Atlanta.  Id. at 3:11–3:15.  Trooper Sikes next asked who owned the car; Defendant stated it was

a rental car in her name.  Id. at 3:17–3:20.  Defendant told Trooper Sikes the rental agreement

was in the car's glove box.  At this point, Trooper Sikes stated he was going to obtain the rental

agreement paperwork "real quick."  Id. at 3:17–3:27.  However, Trooper Sikes did not retrieve

the rental agreement at that time and instead continued to speak with Defendant.  Id. at 3:28.

Trooper Sikes next asked about the purpose of Defendant's travels, and she explained it

was cold in Atlanta and they were going to Jacksonville for warmer weather.  Id. at 3:29–3:39.

At this point, Defendant and Trooper Sikes adjusted their positions, such that both were facing

Defendant's vehicle with their backs to the patrol car.

Trooper Sikes then asked Defendant if she wore glasses or contacts.  Defendant explained she was wearing brown-colored contacts.  Id. at 3:39–3:44.  Trooper Sikes directed Defendant to open her eyes and look at him and directed Defendant to open her mouth and stick out her tongue.  Id. at 3:44–3:58.  Defendant complied with both of Trooper Sikes' directives.  Trooper Sikes testified he asked Defendant to do these things so he could assess her sobriety, including determining whether her taste buds were raised and the color of her tongue because raised taste buds and mouth or tongue discoloration can indicate marijuana consumption.  Trooper Sikes testified he did not smell any alcohol on Defendant's breath or notice any indication of recent marijuana consumption.  Trooper Sikes concluded at that time that field sobriety tests were not necessary and did not conduct any such tests.

After assessing Defendant's sobriety, Trooper Sikes continued questioning Defendant. He asked whether there is anything in the car he "needs to know about," including guns, knives, or weapons, drugs of any sort, or marijuana.  Id. at 3:59–4:06.  Trooper Sikes then asked Defendant about the last time she smoked marijuana.  Id. at 4:07–4:11.  Defendant responded it was about a month ago.  Trooper Sikes followed this up by asking if she smoked any marijuana today or recently; Defendant denied any recent marijuana use.  Id. at 4:12–4:15.  Trooper Sikes asked Defendant if she had taken any medications or is prescribed anything, and Defendant shook her head, answering negatively.  Id. at 4:15–4:21.  Then, Trooper Sikes asked Defendant about her employment status, and Defendant explained she was not currently working.  Id. at 4:22–4:25.

Trooper Sikes asked about the identity of the other passengers in the car.  Id. at 4:25–4:31.  Defendant identified two of the passengers as her friends and the third as a friend of one of the other passengers.  When Trooper Sikes specifically asked Defendant the other passengers'

names, she identified two by nickname—Lennox and Show—and admitted she could not remember the name of the third passenger (the friend-of-a-friend). Id. at 4:32–4:38. Trooper Sikes next asked whether the other passengers were "straight" and if they had anything about which he needed to know. Id. at 4:38–4:43. At the hearing, Trooper Sikes explained he was asking whether the passengers had anything illegal in their possession. Defendant responded by stating she was not aware of them possessing anything he would need to know about. Trooper Sikes then inquired with Defendant about the last time she drank any alcohol. Defendant told him she drank the previous day, but she had not drunk anything the day of the questioning and she was sure nothing was in her system. Id. at 4:45–4:54. This concluded Trooper Sikes' initial questioning of Defendant, which in total lasted about 2 minutes and 40 seconds. Throughout this period of questioning, Defendant cooperated with Trooper Sikes and answered his questions in a casual and courteous manner.

Following this initial questioning, Trooper Sikes again told Defendant he was going to retrieve the rental agreement from the car. He asked Defendant to sit on the hood of his patrol vehicle next to Trooper McCrary, who had stood observing Defendant and her car while Defendant and Trooper Sikes spoke.[3] Trooper Sikes approached the passenger's side of the car to retrieve the rental agreement paperwork to finish processing the ticket. Id. at 5:01–7:48. Another passenger, Kenson Hunte, who was seated in the front passenger's seat, retrieved the paperwork and handed it to Trooper Sikes. Id. at 5:23. Trooper Sikes also asked the other passengers for their IDs, and the other passengers all denied having identification on them. Id. at 5:02–5:21. Because the passengers lacked IDs, Trooper Sikes collected their names and

---

[3]     Trooper McCrary and Defendant appear to be speaking while Trooper Sikes approached the car and spoke with the passengers; however, there is no audio of their exchange. Doc. 65-1 at 5:01–7:48. It appears all of the recorded audio comes from a microphone worn by Trooper Sikes.

birthdates.  Id. at 6:30–7:48.  Trooper Sikes also asked the passengers about their travel plans,

and they all confirmed they were coming from Atlanta and heading to Jacksonville.  Id. at 5:30–

5:37, 6:29–6:31, 7:35–7:41.  Trooper Sikes testified that while retrieving the rental paperwork,

he immediately recognized the smell of marijuana coming from inside the car.  There is no

evidence to suggest Sikes did not smell marijuana at this time, and Defendant does not dispute

this fact.  Indeed, a short time later on the dashcam video, Trooper Sikes confirmed he had just

smelled marijuana.

After Trooper Sikes went to the car to retrieve the rental paperwork, he returned to

Defendant.  Trooper McCrary again asked Defendant about her travel plans, and specifically,

about the luggage in the car.  Id. at 7:50–7:58.  Defendant confirmed her travel plans to

Jacksonville and stated all the passengers packed luggage.  Trooper Sikes again asked Defendant

whether there "[was] anything in the car [he] needs to know about."  Id. at 8:06–8:08.  Defendant

denied having any contraband in the car.  Id. at 8:08–11.  Then, Trooper Sikes attempted to

obtain Defendant's consent to search the car.  Id. at 8:12.  Defendant asked why he would need

to search the car, and Trooper Sikes explained the other passengers were nervous and he

indicated he smelled marijuana by the back passengers.  Id. at 8:12–8:33.  Defendant never

provided consent to search the car.

Trooper McCrary, returned to watching the car as Trooper Sikes continued to speak with

Defendant.  Trooper Sikes encouraged Defendant to cooperate and explained he smelled

marijuana and was going to run all the passengers' names.  Id. at 8:33–9:01.  Trooper McCrary

alerted Trooper Sikes he saw the passengers pass a "card or license" and Trooper Sikes returned

to the vehicle.  Id. at 9:01–9:10.  The passengers explained they were passing the rental

agreement; however, Trooper McCrary insisted he saw them passing something else.  Id. at

9:09–9:24.  At this point, Trooper McCrary ordered Monique Laing to exit the vehicle as well, which she did, and questioned her about what he saw . Id. at 9:23–10:05.  At the same time, Trooper Sikes continued to speak with the other passengers.  Id. at 9:35–9:48.  Trooper Sikes then ordered Laing to sit on the back bumper of the car and for Defendant to sit on the front bumper of the patrol car, and both women complied with his order.  Id. at 10:06–10:15.  Trooper McCrary continued to speak with the other passengers and searched a hoodie he removed from the car.  Id. at 10:08–10:53.  Trooper Sikes then turned his attention and spoke with Laing, explaining his suspicions to her and encouraging her to cooperate.  Id. at 10:28–12:07.  Laing explained during this exchange she had received a speeding ticket earlier in the day.

Trooper Sikes cut off the conversation with Laing, while Trooper McCrary stayed with the car and passengers.  Id. at 12:29.  Off camera, Trooper Sikes continued to question Defendant, relaying his suspicions, and again encouraging her to cooperate with his investigation because it was "evident there was more than just a speeding ticket."  Id. at 12:35–13:50.  Defendant again denied having any knowledge worth relaying to Trooper Sikes, but she confirmed she smelled marijuana on the male passenger in the back seat, Colby Hart, before he got in the car in Atlanta.  Id. at 13:52–14:08.  Trooper Sikes also again asked Defendant about her relationship with the other passengers and Defendant explained how she knew them.  Id. at 14:09–14:24.

Trooper Sikes returned to asking Defendant about her travel plans, as well as whether everyone had luggage for the trip, and Defendant responded everyone brought some luggage.  Id. at 14:26–14:41.  Trooper Sikes again urged Defendant to "help herself" and share any information she has on the other passengers.  Id. at 14:46–15:26.  Trooper Sikes returned his attention to the rental paperwork, as well as asking Defendant about Laing's earlier speeding

ticket, but Defendant had few details to offer—explaining she could not remember where Laing received a ticket.  Id. at 15:27–16:15.  Trooper Sikes once again asked Defendant to tell him anything she knows because she would help herself by cooperating.  Id. at 16:23–17:49.

Defendant remained off-camera, seated on the hood of Trooper McCrary's vehicle as Trooper Sikes returned the rental agreement to the car.  Id. at 17:57–18:17.  Trooper Sikes also spoke with the male passengers, who remained in the car.  Trooper Sikes told them of his suspicions this stop was "more than just a speeding ticket," and he smelled marijuana in the car. He informed them of Trooper McCrary's suspicions about Laing stuffing something in the car seat.  Id. at 18:21–20:06.

Finally, Trooper Sikes returned to his patrol car with Trooper McCrary.  Id. at 20:09. Trooper Sikes and Trooper McCrary discussed their findings and conversations with each other, comparing the passengers' stories and agreeing they both smelled marijuana.  Id. at 20:10–21:00. Trooper McCrary also told Trooper Sikes he saw Laing stuff either IDs or credit cards between her legs or under the seat, but he looked and did not see any cards in the seat.  Id. at 20:55–21:12, 22:00–22:18.  While talking in the patrol car with Trooper McCrary, Trooper Sikes ran Defendant's and the passengers' names.  Id. at 21:00–25:20.  As Trooper Sikes was running their names, he directed Trooper McCrary to ask Laing for her middle name, and Trooper McCrary exited the patrol vehicle to gather that information.  Id. at 22:31–23:09.  Also, when in the patrol car, the troopers discussed whether they had probable cause to search Defendant's car based on the stop, including their detection of marijuana.  Id. at 24:14– 24:50.  After deciding they had probable cause to search the car, Trooper Sikes directed Trooper McCrary to call over his radio and request a female officer and a drug dog, which he did.  Id. at 24:50–25:23.  At this point, the stop had been going on for about 23 minutes.

Trooper Sikes returned to Defendant, again off camera, and again asked her about the male passengers.  Id. at 25:25–26:00.  Trooper Sikes then returned to the car to ask the rear passenger, Colby Hart, his name, birthdate, and address again, and if he had an ID.  Id. at 26:02–27:14.  Trooper Sikes then spoke again with Laing, who asked why they were still detained.  Id. at 27:22–27:25.  Trooper Sikes explained she had outstanding warrants in another state, which she disputed.  Id. at 27:30–29:05.  Trooper Sikes went back to Defendant and continued to inquire about Hart's identity and how Defendant knew him.  Id. at 29:10–30:24.

When Trooper Sikes finished speaking with Defendant, he and Trooper McCrary returned to the patrol vehicle and again discussed their findings of their investigation up to this point and whether they should search Defendant's car.  Id. at 30:40–33:14.  As the troopers were sitting in the patrol car, Trooper McCrary received a call over his radio confirming he needed a female officer to search Defendant and Laing.  Id. at 33:15–33:40.  Trooper McCrary exited the patrol car and returned to watching Laing, Hunte, and Hart and stated he observed more movement by the passengers.  Id. 33:45–36:05.  Troopers McCrary and Sikes sat in the patrol car for the next 11 minutes, speaking occasionally, until Trooper Sikes returned to Defendant.  Id. at 36:06–47:10.  Trooper Sikes once more asked Defendant about the other passengers' identities and how they knew one another.  Id. at 47:11–48:20.

A female officer finally arrived—more than 20 minutes after Trooper McCrary first radioed dispatch—at which point Trooper Sikes described the situation.  Id. at 48:24–51:25.  The female officer searched Defendant and then searched Laing.  Id. at 51:27–1:00:30.  Shortly thereafter, another officer, presumably the canine officer, also arrived and Trooper Sikes informed him of the situation as well.  Id. at 52:14–53:30.  The canine officer directed Trooper Sikes to have the remaining passengers—Hart and Hunte—exit the vehicle, which he did, so the

canine could search the car.  Id. at 53:31–54:41.  Troopers McCrary and Sikes also patted down Hunte and Hart during this time.  Id. at 54:30–54:52.  The canine unit then sniffed and searched the car.  Id. at 55:02–56:00.  As the canine searched the vehicle, Trooper Sikes talked with Hunte about a large amount of cash he had on him.  Id. at 55:05–55:45.  Trooper Sikes also spoke with Hunte about how he knew Hart and about the stop generally.  Id. at 56:18–59:18.  Then Trooper Sikes spoke with Hart directly about what might be in the car and his relationship with the other passengers.  Id. at 1:00:56–1:01:57.  After Trooper Sikes finished speaking with Hart, he and another law enforcement officer searched the vehicle.[4]  Id. at 1:02:03–1:14:01.  During the search Trooper Sikes found what he described as fake IDs, either spice, marijuana, or a combination of the two, and a large amount of cash.

Following the search of the car, Trooper Sikes searched Hunte.  Id. at 1:14:05–1:18:50.  Trooper Sikes next asked Defendant and Hunte who owed a purple bag located in the truck.  Id. at 1:18:51–1:19:30.  No one claimed the bag.  Trooper Sikes and the other officers discussed the contraband they found, including the fake IDs and marijuana, as a result of the search.  Id. at 1:20:11–1:36:34.  After speaking with the other officers, Trooper Sikes briefly returned to Hunte and asked him about his criminal history and his identity.  Id. at 1:36:36–1:39:28.  Trooper Sikes explained he had not yet been able to confirm Hunte's identity.  Trooper Sikes and the female officer then resumed their discussions on how to handle the arrest of Defendant, Hunte, Laing, and Hart.  Trooper Sikes continued to discuss the situation over his radio and with the other officers on the scene and confirm the identity of the car's occupants.  Id. at 1:39:29–2:06:09.  Trooper Sikes and the officers also made the decision to arrest Defendant, Laing, Hunte, and

---

[4]     The officer assisting Trooper Sikes in the search of Defendant's car appears to be a member of the Brunswick Police Department, which is consistent with Trooper Sikes' report and testimony. Doc. 65-2.

Hart for the fake IDs and marijuana.  Trooper Sikes, Trooper McCrary, and other law enforcement officers also conducted an additional search of the car, recovering more evidence, and communicated with local law enforcement about custody of Defendant and the other passengers.  Id. at 2:06:10–2:45:10.  Ultimately, Brunswick Police officers arrested Defendant and the three passengers, and they remained in the officers' custody.

As a result of the search, law enforcement recovered 44 false identification cards, a large sum of cash, and marijuana.  All four passengers, including Defendant, were charged.  Defendant was indicted for possession with intent to use five or more false identification documents, in violation of 18 U.S.C. § 1028(a)(3).  Defendant has been arraigned and entered a plea of not guilty.  All three other passengers, Kenson Hunte, Monique Laing, and Colby Hart, were also charged and indicted under 18 U.S.C. § 1028(a)(3).  Hart's plea agreement was accepted on November 30, 2020, and the Honorable Lisa Godbey Wood sentenced Hart on March 30, 2021.  Likewise, Laing entered a plea agreement, which was also accepted on November 30, 2020, and Judge Wood sentenced her on April 19, 2021.  However, Hunte has entered a plea of not guilty and his charge resulting from the March 6, 2019 traffic stop remains pending.

At the Court's January 25, 2021 hearing, Trooper Sikes testified he initially pulled Defendant over for speeding but was suspicious other criminal behavior may have been afoot, even before he began speaking with Defendant.  Trooper Sikes explained he was concerned as soon as he pulled the car over and that is why he called in the stop over the radio.  He stated prior to smelling marijuana, his suspicions were based on the car's high rate of speed and the fact it was approaching a busy intersection.  Trooper Sikes explained certain behavior increased his suspicion even before he smelled marijuana.  First, he became more suspicious due to the amount of time it took Defendant to pull over after he activated his lights and began pursuing

her.  Additionally, once Defendant pulled over, Trooper Sikes testified his suspicions grew based on the following facts: movement in the car by the passengers; Trooper Sikes having to order Defendant twice to get out of the car; Defendant's "blank look" upon exiting the car; and Defendant did not seem to know the other passengers.

Trooper Sikes testified he was suspicious of general criminal activity based on his experience and intuition, and he questioned Defendant based on that suspicion.  After Trooper Sikes detected marijuana, he determined he had probable cause to detain Defendant and the other passengers and to conduct a search of her car.  Once Trooper Sikes, with the help of other law enforcement, conducted that search and uncovered the marijuana and fake IDs, which form the basis of Defendant's criminal charges, he determined Defendant and the other passengers needed to be arrested.  However, he called the Brunswick Police Department to arrest them, as he felt the Brunswick Police Department had better resources to finish investigating the criminal activity.

## ANALYSIS AND RECOMMENDATION

Defendant argues Trooper Sikes violated her Fourth Amendment rights by asking impermissible questions, and, consequently prolonging the traffic stop, in violation of Rodriguez v. United States, 575 U.S. 348 (2015).  Doc. 65.  Defendant argues the impermissible questioning requires exclusion of the evidence seized during the search.

In response, the Government argues there was no Rodriguez violation resulting from Trooper Sikes' questioning because: (1) the questions asked were ordinary inquiries incident to the traffic stop for speeding, and (2) even if they were not, Trooper Sikes had reasonable suspicion to believe Defendant was involved in other criminal activity.  Doc. 73.

The Government also argues, even if Trooper Sikes' questioning impermissibly prolonged the traffic stop, the inevitable-discovery exception to the exclusionary rule applies and the evidence recovered should not be excluded.  Id. at 18.

Defendant disagrees and argues the inevitable-discovery exception does not apply here because the stop became unduly prolonged prior to Trooper Sikes approaching the car for the rental agreement.  Docs. 85, 120.  Defendant also argues Trooper Sikes impermissibly prolonged the stop even after detecting marijuana, and thus, the search was unconstitutional.[5]  Doc. 65.  The Government disagrees.  Doc. 73.

Thus, to resolve Defendant's Motion to Suppress, the Court must determine: (1) whether Trooper Sikes' questioning was impermissible under Rodriguez; (2) even if Trooper Sikes' search was unconstitutional, whether the inevitable-discovery exception applies and prevents exclusion of the evidence; and (3) whether Trooper Sikes impermissibly prolonged the stop even after detecting marijuana.

## I.     Whether Trooper Sikes' Initial Questions Were Impermissible Under Rodriguez

The parties agree—and the record plainly shows—there was probable cause for Trooper Sikes to stop Defendant for speeding and to investigate that offense.  However, the parties disagree about whether Trooper Sikes asked impermissible questions during the first portion of the stop, thereby prolonging the stop.  As explained below, I find some of Trooper Sikes initial questions were not ordinary inquiries incident to the stop for speeding, and Trooper Sikes did not

---

[5]     It is important to note Defendant does not dispute Trooper Sikes had probable cause to search the vehicle once he detected the odor of marijuana inside the vehicle.  Rather, Defendant contends Trooper Sikes' questions before he detected that odor violated the Fourth Amendment, and Trooper Sikes' delay in conducting the search after detecting the odor violated the Fourth Amendment.  Defendant contends these constitutional violations require exclusion of the evidence.

have reasonable suspicion to investigate other crimes prior to smelling marijuana in Defendant's vehicle.  Therefore, these questions impermissibly prolonged the stop in violation of Rodriguez.

A traffic stop may last no longer than is necessary to address the traffic violation and related safety concerns.  United States v. Campbell, 912 F.3d 1340, 1350 (11th Cir. 2019) (citing Rodriguez, 575 U.S. at 354), *vacated for reh'g en banc* 981 F.3d 1014 (11th Cir. 2020).[6]  "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop.  But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  Rodriguez, 575 U.S. at 355; see also Campbell, 912 F.3d at 1351.  The United States Supreme Court in Rodriguez differentiated between "'ordinary inquiries incident to a traffic stop' [and] unrelated tasks . . . 'aimed at detecting criminal activity more generally.'"  Campbell, 912 F.3d at 1351 (quoting United States v. Green, 897 F.3d 173, 179 (3d Cir. 2018)).  Ordinary inquiries incident to a traffic stop include checking the driver's license, checking for outstanding warrants against the driver, inspecting the vehicle's registration and insurance, and asking questions about travel plans.  Rodriguez, 575 U.S. at 355; Campbell, 912 F.3d at 1354.  Unrelated inquiries that impermissibly prolong the traffic stop

---

[6]     The Eleventh Circuit Court of Appeals' decision in United States v. Campbell, 912 F.3d 1340 (11th Cir. 2019), has been vacated and is pending en banc review.  Defendant has submitted supplemental briefing concerning the status of Campbell.  See Docs. 96, 103, 151.  The Eleventh Circuit's Memorandum to Counsel or Parties on the en banc rehearing directed the parties to address whether the good-faith exception to the exclusionary rule was a proper ground for affirming petitioner's conviction despite the Government's failure to raise that alternative ground before the panel.  United States v. Campbell, Case No. 16-10128 (11th Cir. Jan. 5, 2021).  I have reviewed the briefing related to the en banc review and note it exclusively concerns the application of the good-faith exception.  Based on this, it appears the Eleventh Circuit's original analysis of the Rodriguez issue remains unchallenged.  The good-faith exception is not at issue in this case.  Thus, I cite to the vacated Campbell decision and consider the analysis in that decision as merely instructive, and not binding, given the procedural posture of that case.  Citations to Campbell in the remainder of this Report omit references to vacatur and rehearing for the sake of brevity.

absent reasonable suspicion include, for example, questions concerning whether the driver is transporting counterfeit merchandise, illegal drugs, or dead bodies.  Campbell, 912 F.3d at 1354–55.

The Rodriguez and Campbell decisions explain officers are not permitted to question drivers about criminal activity unrelated to the reason for the traffic stop if doing so prolongs the stop by any amount of time.  Id. at 1352.  In fact, a single unrelated question adding a few seconds to the stop's duration is a violation of an individual's Fourth Amendment rights because diligence in completing a traffic stop "does not provide an officer with cover to slip in a few unrelated questions."  Id. at 1353.  Further, it is immaterial whether the impermissible questions occurred before or after the officer issued the citation and ended the traffic stop.  See id. ("[T]he critical question is not whether the unrelated inquiry occurs before or after the officer issues the ticket but whether conducting the unrelated inquiry 'prolongs'—i.e., adds time to 'the stop.'") (alterations in original) (quoting Rodriguez, 575 U.S. at 357).

That said, an officer is still permitted to make "ordinary inquiries incident to [the traffic] stop."  Id. at 1352 (citing Rodriguez, 575 U.S. at 355).  These inquiries involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  Id.  For instance, questions about travel plans are usually considered ordinary inquiries incident to a traffic stop.  Id. at 1356 (citing cases).  Similarly, questions aimed at discerning the identity of other passengers are permissible.  United States v. Waller, No. 1:15-cr-0083, 2015 WL 1373672, at *3–4 (N.D. Ga. Dec. 14, 2015).  In sum, officers are still permitted to ask these types of questions which allow them to ensure "vehicles on the road are operated safely and responsibly."  Id.

In her Motion, Defendant challenges 18 questions Trooper Sikes asked from the time

Trooper Sikes obtained her license until he went to obtain the rental paperwork from the car as

Rodriguez violations.  Doc. 120 at 21–22; see also Doc. 65 at 9–10 (identifying impermissible

questions).[7]  The questions occur between the timestamps of 3:58 and 5:00 on the dashcam

footage.  Defendant challenges the following questions, grouped by categories identified in bold:

**Questions about contraband in the vehicle.**

1.      Is there anything in the car I need to know about?  Doc. 65-1 at 3:58–4:01.

2.      Guns, knives, weapons?  Id. at 4:02.

3.      Drugs of any sort?  Id. at 4:04

4.      Marijuana?  Id. at 4:05.

5.      Are [the other passengers] straight?  Id. at 4:38–4:40.

6.      Do [the other passengers] have anything on them?  Id. at 4:40–4:42.

**Questions about drug and alcohol use.**

7.      When was the last time you smoked [marijuana]?  Id. at 4:07–4:08.

8.      So, nothing today?  Id. at 4:11.

9.      Nothing recently?  Id. at 4:12–4:13.

10.     Do you take medications?  Id. at 4:16.

11.     Prescribed anything?  Id. at 4:18.

12.     100%?  Id. at 4:19.

13.     When is the last time you drank alcohol?  Id. at 4:46–4:47.

14.     So, nothing today?  Id. at 4:49–4:50.

---

[7]     Defendant concedes questions relating to the car's speed, her travel plans, and whether the car is a rental are permissible.  Doc. 65 at 10.

15.     100%?  <u>Id.</u> at 4:51–4:53.

**Question about Defendant's employment.**

16.     You working anywhere?  <u>Id.</u> at 4:20–4:21.

**Questions about passengers' identities.**

17.     Who is in there with you?  <u>Id.</u> at 4:26–4:28.

18.     Do you know their names?  <u>Id.</u> at 4:31–4:32.

In response, the Government makes three primary arguments.  First, the Government contends <u>Rodriguez</u> does not apply here because Trooper Sikes had not issued a citation at the time of the questioning.  Doc. 73 at 12.  Second, the Government argues all of Trooper Sikes' questioning was permissible under <u>Rodriguez</u> and <u>Campbell</u> because the questioning involved "ordinary inquiries . . . reasonably related to his initial purpose for the stop."  Doc. 73 at 12; Doc. 119 at 14–17.  Third, the Government contends Trooper Sikes had reasonable suspicion to believe other criminal activity was afoot and, therefore, was permitted to ask questions investigating other criminal activity.  Doc. 119 at 6–14.  Each argument is addressed below.

    **A.     <u>Rodriguez</u> Applies to an Ongoing Traffic Stop**

The Government first argues the limitations described in <u>Rodriguez</u> and <u>Campbell</u> do not apply in this case because the traffic stop was still ongoing at the time Trooper Sikes questioned Defendant.  Doc. 73 at 12, 17.  In other words, the Government argues Trooper Sikes' questions were permissible because he had not yet issued Defendant a speeding ticket.  Doc. 73 at 12, 17.  This same argument was considered and rejected in both <u>Rodriguez</u> and <u>Campbell</u>.  <u>See</u> <u>Rodriguez</u>, 575 U.S. at 357 ("The critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop'"); <u>see also</u> <u>Campbell</u>, 970 F.3d at 1354 (citing <u>Rodriguez</u> for the proposition "an

officer can prolong a stop before or after completing the [traffic] investigation").  Thus, any argument Trooper Sikes did not violate Defendant's Fourth Amendment rights because the conduct at issue occurred prior to issuing the traffic ticket is foreclosed by precedent.

**B.    Some of Trooper Sikes' Initial Questions Violated <u>Rodriguez</u> Absent Reasonable Suspicion**

>    *1.    Questions about contraband in the vehicle.*

Defendant challenges questions about her having contraband in the car.  Trooper Sikes asked Defendant if "there [is] anything in the car [he] need[s] to know about?  Guns, knives, weapons?  Drugs of any sort?  Marijuana?"  Doc. 120 at 21; Doc. 65 at 10–11; Doc. 65-1 at 3:58–4:05.  In the same vein, Trooper Sikes asked whether the passengers had any contraband on them—asking if they were "straight," whether they "ha[d] anything on them," or "might" have had "something on them."  Doc. 120 at 21; Doc. 65 at 10–11; Doc. 65-1 at 4:38–4:42.  Trooper Sikes explained at the hearing his questions about the passengers were intended to determine whether they had anything illegal on them, including drugs.

The Government contends all these questions are related to an officer's safety concerns. Doc. 119 at 17.  However, questions about drugs or weapon in the car, absent reasonable suspicion for drug or gun crimes, are impermissible.  In fact, <u>Campbell</u> expressly concluded questions about contraband in a vehicle were impermissible, absent reasonable suspicion of other crimes.  <u>See</u> <u>United States v. Byron</u>, 817 F. App'x 753, 756 (11th Cir. 2020) (finding an officer unconstitutionally prolonged a stop based on following too closely when the officer stopped writing the citation to ask "unrelated inquiries aimed at investigating other crimes—[like] whether the defendant had any luggage, weapons, or illegal items in the car"); <u>Campbell</u>, 970 F.3d at 1356 (holding inquiries about drugs and contraband in the car when a stop was effectuated for a malfunctioning turn signal unlawfully prolongs the traffic stop).

Like the questions about contraband in the car generally, the Government contends the questions about whether the passengers possess contraband are related to safety concerns.  But the questions about whether the passengers had anything illegal, including drugs, impermissibly prolonged the stop and violated Defendant's Fourth Amendment rights for the same reason the questions about general contraband in the car did.  These questions were not related to the reason for the stop—Defendant's speeding.  See Byron, 817 F. App'x at 756 (11th Cir. 2020); Campbell, 970 F.3d at 1356 (holding inquiries about drugs and contraband in the car when a stop was effectuated for a malfunctioning turn signal unlawfully prolongs the traffic stop); United States v. Brinson, CR 119-096, 2019 WL 7476672, at *3–4 (S.D. Ga. Dec. 4, 2019) (holding an officer was not permitted to inquire about drug possession aimed at detecting unrelated crimes during a traffic stop).

Accordingly, I find Trooper Sikes violated Rodriguez when asking questions about contraband in the car, including whether the other passengers had any contraband, and impermissibly prolonged the stop.[8]

### 2.  Questions about drug and alcohol use.

Defendant challenges Trooper Sikes' questions related to marijuana and alcohol use and prescription medication, including historic alcohol and marijuana use.  Doc. 120 at 21–22.  Specifically, Defendant challenges Trooper Sikes asking the last time Defendant smoked any marijuana, including whether she smoked any today, whether she was taking any medications or "prescribed anything," and when the last time she drank alcohol, including whether she drank anything that day.  Doc. 65-1 at 4:11–4:19, 4:46–4:52.  The Government argues these questions

---

[8]     The Government also argues Trooper Sikes could ask these questions without violating Rodriguez because he had reasonable suspicion to believe other criminal activity was afoot.  That argument is addressed below in § I(C).

are permissible because they relate to Defendant's ability to safely and responsibly operate the car.  Doc. 119 at 17.

In many situations, questions about a driver's sobriety will be directly tied to a stop's purpose.  Such would be the case when an officer had reasonable suspicion or probable cause to suspect a diver is under the influence of drugs or alcohol.  See United States v. Rizzo, Case No. 4:18-MJ-109, 2019 WL 238147, at *2 (M.D. Ga. Jan. 16, 2019) (holding an officer did not divert from the traffic stop's original purpose to investigate driving under the influence when the officer had reason to believe—based on the defendant's strong smell of alcohol, glossy and red eyes, and wristband from a bar or club—the defendant is in fact, driving under the influence); United States v. Marin, 988 F.3d 1034, 1042 (8th Cir. 2021) ("Here, Deputy Edwards discovered information leading to reasonable suspicion of drug use.  He was therefore justified in prolonging the stop in order to question Marin further and to call Deputy Julius to investigate whether Marin was under the influence of drugs.") (citation omitted).  However, in this case, the record demonstrates Trooper Sikes questioned Defendant about drug and alcohol usage even though there was no indication she was under the influence.

Before asking Defendant questions about marijuana, prescription drugs, and alcohol, Trooper Sikes examined Defendant's eyes, and inquired about her contacts, had Defendant stick out her tongue so he could look in her mouth, and had already been talking to Defendant for approximately two minutes.  See Doc. 65-1 at 2:39–3:58.  At the hearing, Trooper Sikes testified he asked Defendant about her contacts and to stick out her tongue to detect any recent marijuana use or alcohol on her breath.  Following this examination of Defendant's eyes and mouth, Trooper Sikes testified he did not detect any evidence suggesting Defendant was under the influence of drugs or alcohol and, consequently, declined to administer any field sobriety tests.

In other words, Trooper Sikes had already determined Defendant was not under the influence of drugs or alcohol before he began asking her about the last time she used marijuana, alcohol, or prescriptions.  Doc. 65-1 at 4:11–4:19, 4:46–4:52.  At the point at which Trooper Sikes' suspicions about Defendant's sobriety were dispelled, any questions about her sobriety were no longer related to the purpose of the stop—Defendant's speeding.[9]  See United States v. Jones, 438 F. Supp. 3d 1039, 1054 (N.D. Cal. 2020) (finding questions about marijuana in the car are impermissible, where among other things, there was no evidence defendant was driving under the influence of marijuana).  Importantly, unlike the officers in Rizzo and Marin, Trooper Sikes had already determined Defendant was not under the influence well before he asked his questions.

Even if Trooper Sikes' questions about Defendant's impairment and immediate alcohol and drug use were permissible as related to safe operation of the vehicle, his questions concerning Defendant's historic marijuana or alcohol use were unrelated and impermissible.  See Doc. 65-1 at 4:07–4:08 (Trooper Sikes' asking, "When was the last time you smoked [marijuana]?"); id. at 4:12–4:13 ( "Nothing recently?").  Trooper Sikes confirmed at the hearing this questioning was unrelated Defendant's speeding.  Trooper Sikes also acknowledged any historic drug or alcohol use cannot form the basis to arrest Defendant for driving under the influence or other traffic-related offense.  Instead, it appears these questions are aimed at general criminal wrongdoing, which again Rodriguez expressly prohibits unless supported by at least reasonable suspicion.

---

[9]     Although not argued by the Government, speeding could potentially be indicative of impaired driving.  But once Trooper Sikes began questioning and observing Defendant, any such concern was dispelled.

In sum, the Government's explanation for Trooper Sikes asking about Defendant's drug and alcohol use is contradicted by Trooper Sikes' testimony and, like the questions about drugs or weapons in the car, are an unconstitutional prolongation of the traffic stop unless supported by reasonable suspicion.

### 3.    Question about Defendant's employment.

Defendant contends Trooper Sikes was not permitted to ask Defendant if she was "working anywhere." This question again is unrelated to the offense of speeding and likewise unconstitutionally prolonged the stop. See United States v. Pruitt, 174 F.3d 1215, 1221 (11th Cir. 1999) (finding the question of "What do you do for a living?" during a speeding stop was a "fishing expedition" question that was simply irrelevant). Other courts have also found questions related to employment are unrelated to traffic stops. See United States v. Trevino, Case No. 1:13-CR-0324, 2015 WL 859386, at *8 (N.D. Ga. 2015) (finding questions related to a driver-defendant's employment are unrelated to the traffic stop but holding questions did not prolong the stop because the stop was only extended by a short time); see also United States v. Macias, 658 F.3d 509, 519 (5th Cir. 2011) (finding questions about the defendant's employment unrelated to the traffic stop). Importantly, the decision in Trevino, where the district court found the stop was not impermissibly prolonged, was issued before the Supreme Court's rejection of the de minimis-time doctrine in Rodriguez. Thus, the court in Trevino found the questions did not violate the defendant's constitutional rights because the "unrelated question did not take very long to ask or answer." Trevino, 2015 WL 859386, at *8. However, that court's conclusion that questions about employment were "unrelated" to the traffic stop remains instructive. Further, other courts post-Rodriguez have found extraneous questions, such as those about work, impermissibly prolong a traffic stop. See e.g., United States v. Valverde, No. CR 1:18-10005,

2018 WL 9618060, at *6 (W.D. Tenn. Sept. 10, 2018) (noting questions during stop about defendant's employer and how defendant obtained his job were extraneous and impermissible).

The Government argues the Campbell court found questions related to employment "not objectionable." Doc. 119 at 16. Although the officer conducting the stop in Campbell asked questions about the defendant's employment, the Eleventh Circuit Court of Appeals' decision is silent on whether those questions were permissible. Moreover, treating a question about employment as unrelated to investigating of speeding is consistent with the Eleventh Circuit's holding in Campbell that a "stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes." 912 F.3d at 1355.

The Government also argues Trooper Sikes' employment question was intended to ensure Defendant could safely and responsibly operate her car. Doc. 119 at 17. In this same vein, Trooper Sikes testified the purpose of the question was to identify any kind of odor of alcohol. That is, Trooper Sikes asked Defendant about her job as a pretext to further assess her sobriety and determine whether she could safely operate her car. This "pretext" justification does not withstand scrutiny.

Trooper Sikes asked the question about Defendant's employment 4 minutes and 20 seconds into the stop. Doc. 65-1 at 4:20. This question occurred after he had been talking to Defendant in close proximity for almost two and a half minutes, had examined the inside of her mouth and her pupils, id. at 3:44–3:58, had questioned her about her prescription drug and marijuana use, id. at 4:07–4:19, and had already determined there was no need to conduct a field sobriety test based on his own testimony. Consequently, I find Trooper Sikes' question about Defendant's employment violated Rodriguez and improperly prolonged the stop.

4.      *Questions about passengers' identities.*

Defendant also contends questions related to the passengers' identities impermissibly prolonged the traffic stop.  Specifically, Trooper Sikes asked Defendant about the identity of the passengers and their names.  Doc. 65-1 at 4:26–4:32.

I find Trooper Sikes asking who else was in the car and if Defendant knew their names does not violate Rodriguez.  An officer may prolong a traffic stop to investigate the driver's license and the vehicle registration and may do so by requesting a computer check.  United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  Indeed, even post-Rodriguez, the justification to run routine computer checks to investigate identities extends to "a vehicle's occupants."  United States v. Waller, No. 1:15-cr-0083, 2015 WL 13736272, at *3 (N.D. Ga. Dec. 14, 2015) (citing Purcell, 440 U.S. at 653).  After all, "passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well." Id. at *3–4 (quoting United States v. Rice, 483 F.3d 1079, 1084 (10th Cir. 2007) (citing Maryland v. Wilson, 519 U.S. 408, 413–14 (1997); and United States v. Jenson, 462 F.3d 399, 403–04) (5th Cir. 2006)).  Further, in Rodriguez, the Supreme Court reiterated the "mission" of the stop includes ordinary computer and other identity checks.  575 U.S. at 349 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'  Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.") (internal citations and quotations omitted). Accordingly, Defendant's challenges to questions about the passengers' identities fail as Trooper

Sikes was permitted to inquire into the identity of the passengers even under the <u>Rodriguez</u> framework.  <u>Waller</u>, 2015 WL 1373672, at *4.

Considering these facts, I conclude Trooper Sikes violated the Fourth Amendment by delaying processing Defendant's license and issuing the traffic citation and prolonging the stop when he questioned Defendant to determine whether she was involved in other criminal wrongdoing.  Doc. 65-1 at 3:42–5:00.  Even though less than 90 seconds elapsed between the moment Trooper Sikes began the impermissible questioning and when Trooper Sikes approached the car to continue issuing the speeding ticket, this series of impermissible questions unconstitutionally prolonged the traffic stop and exceeded its narrow purpose.  In <u>Campbell</u>, the Eleventh Circuit held prolonging a stop 25 seconds to ask unrelated questions concerning criminal activity was unconstitutional.  <u>Campbell</u>, 912 F.3d at 1353.  Thus, any prolongation, even a few seconds, resulting from impermissible inquiries unsupported by reasonable suspicion are unconstitutional.  <u>Rodriguez</u>, 575 U.S. at 356–57; <u>see also</u> <u>Brinson</u>, 2019 WL 7476672, at * 3 (finding a 100-second extension of a traffic stop unconstitutional under <u>Rodriguez</u>); <u>United States v. Williams</u>, CR419-103, 2020 WL 5405782 (S.D. Ga. Mar. 18, 2020) (finding a traffic stop prolonged by 90 seconds by a <u>Rodriguez</u> violation unconstitutional).  Here, several of Trooper Sikes' questions were impermissible questions aimed at detecting crime generally and unrelated to Trooper Sikes stopping Defendant for speeding.  Thus, Trooper Sikes impermissibly prolonged the stop by asking these questions unless he had reasonable suspicion to investigate other criminal wrongdoing.

**C.    Trooper Sikes did not Have Reasonable Suspicion to Investigate Crimes Other Than Speeding During his Initial Questioning**

The Government also argues Trooper Sikes' disputed questioning does not violate <u>Rodriguez</u> because he had reasonable suspicion to believe criminal activity other than speeding

was occurring, and, therefore, he was permitted to investigate that activity.  Doc. 73 at 13–16.

Defendant argues the circumstances Trooper Sikes encountered at the time of his questioning

provided no basis for suspecting other criminal activity was occurring.  Doc. 85 at 9–21.

To determine if Trooper Sikes had reasonable suspicion to believe other criminal activity

was afoot, the Court must consider the "totality of the circumstances" and whether there was a

"particularized and objective basis" for suspecting legal wrongdoing.  United States v. Arvizu,

534 U.S. 266, 273 (2002); see also United States v. Williams, 619 F.3d 1269, 1271 (11th Cir.

2010) (same).  Put differently, reasonable suspicion "takes into account 'the totality of the

circumstances—the whole picture.'"  Navarette v. California, 572 U.S. 393, 397 (2014).

Assessing the whole picture "does not deal with hard certainties, but with probabilities."  United

States v. Cortez, 449 U.S. 411, 418 (1981); United States v. Lewis, 674 F.3d 1298, 1304 (11th

Cir. 2012).  Reasonable suspicion "need not rule out the possibility of innocent conduct," but

rather depends on a commonsense approach based on "the factual and practical considerations of

everyday life on which reasonable and prudent men, not legal technicians, act."  Navarette, 572

U.S. at 402 (internal quotations omitted).

The Government argues Trooper Sikes had "articulable reasonable suspicion" to suspect

criminal activity beyond speeding based on the totality of the circumstances.[10]  Doc. 73 at 12–13.

The Government contends this reasonable suspicion was based on the following facts:

(1) Defendant's excessive speeding; (2) Defendant's failure to promptly pull over; (3) out-of-

---

[10]     The Government appears to argue in its supplemental brief that because probable cause existed to seize Defendant for speeding, probable cause necessarily existed to search Defendant's car.  Doc. 119 at 5.  The Government cites cases discussing warrantless searches pursuant to an arrest.  Id.  First, these cases are inapplicable to the case at hand because the search occurred prior to any arrest.  Further, the Government's argument that Trooper Sikes could seize Defendant and search her vehicle based solely on probable cause to believe Defendant was speeding is contrary to Rodriguez.

state license plate; (4) occupant movement in the car; (5) having to ask the driver twice to step

out of the car; (6) Defendant's "blank look" when approaching Trooper Sikes; (7) Defendant's

statement she was taking a trip to Jacksonville, Florida, from Atlanta, Georgia, to "get away"

from the cold weather in Atlanta; and (8) Defendant's inability to identify the other occupants in

the car.[11] Id. at 13–14.

       The Government's first argues Defendant's speeding provided reasonable suspicion to

believe other criminal activity was occurring.  Specifically, the Government contends

Defendant's high rate of speed, which continued even after Trooper Sikes activated his lights,

and Defendant's admission she did not see Trooper Sikes while speeding support a reasonable

suspicion of criminal activity other than speeding.  Doc. 73 at 13.  Speeding may provide

reasonable suspicion of criminal activity, especially when paired with other facts, such as

speeding through a high-crime area or immediately following gun shots.  United States v.

Bradley, No. CR409-167, 2009 WL 4281260, at *4 (S.D. Ga. Nov. 5, 2009) (holding an officer

had reasonable suspicion to stop a vehicle in order to investigate criminal activity where the

officer heard nearby gunfire just before spotting the speeding vehicle coming from the direction

of the gun shots) (citations omitted); Mobley v. City of Birmingham, No. 2:17-CV-00871, 2020

WL 7353338, at *7 (N.D. Ala. Nov. 20, 2020) ("An objectively reasonable officer would have

arguable reasonable suspicion to stop an individual driving evasively and possibly speeding

through a high-crime neighborhood at dusk.").  Stated differently, speeding could indicate

fleeing from a crime or other crimes such as stealing a car or driving under the influence—but

---

[11]    This inquiry is focused solely on the facts known to Trooper Sikes when he initially questioned Defendant.  Thus, the fact Trooper Sikes later smelled marijuana emanating from the car is irrelevant to whether he had reasonable suspicion of other criminal activity before that point when the challenged questioning occurred.

only if there are other facts that suggest the speeding is connected to some other illegal activity. Speeding on its own does not indicate there is some other criminal activity occurring. And, as explained below, Trooper Sikes was not aware of any other facts that—if coupled with an observation of speeding—would have given rise to reasonable suspicion of other criminal activity. Thus, Defendant's speeding did not provide Trooper Sikes with any additional basis for suspecting other criminal wrongdoing.

The Government also points to Defendant's failure to promptly pull over after Trooper Sikes began pursuing her for speeding. Trooper Sikes first identified Defendant's excessive speed when he passed her, going the opposite direction. Trooper Sikes immediately activated his lights, made a U-turn, and began pursuing Defendant. It took Trooper Sikes about 45 seconds to catch up to Defendant. Once Trooper Sikes pulled behind Defendant, she promptly braked, activated her turn signal, and pulled over. There is no indication Defendant was aware of Trooper Sikes prior to him pulling up behind her, and in fact, she admitted when speaking with Trooper Sikes she did not see him travelling northbound. Accordingly, I find the record demonstrates Defendant did not fail to promptly stop when Trooper Sikes pursued her, and these circumstances do not provide any additional basis for Trooper Sikes' purported suspicions.

Next, the Government points to Defendant's out-of-state license plates and her use of a rental car. Id. at 13–14. However, the Eleventh Circuit has rejected the view that driving, even while speeding, with an out-of-state license plate provides an indication other criminal wrongdoing is afoot. United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990) (noting an out-of-state license plate, along with other concerns, "fail[ed] to suggest that appellant . . . [was] engaged in any criminal activity other than speeding on the highway"); Pruitt, 174 F.3d at 1221 (noting out-of-state license plate, along with other concerns, did not support finding of

reasonable suspicion).  Similarly, traveling in a rental car cannot form the basis for reasonable suspicion.  Evans v. Stephens, 407 F.3d 1272, 1280 (11th Cir. 2005) (rejecting the view that traveling in a rental car, even when combined with a nervous driver and unusual travel plans, provides reasonable suspicion).

The Government argues the occupants' excessive movement in the car at the outset of the stop supports reasonable suspicion.  Doc. 73 at 13.  The dashcam video in this case does not show much, if any, movement by the passengers.  It only shows the passengers talking to one another for about 45 seconds after Trooper Sikes pulled over Defendant.  Doc. 65-1 at 1:19–2:02.  At most, the video shows the occupants' upper bodies move slightly, but nothing unusual, and nothing indicating any of the passengers were preparing to flee.  Trooper Sikes testified he saw and felt the passengers moving.  Trooper Sikes was closer to the car with a different vantage point than the dashcam.  I find Trooper Sikes' testimony he saw more movement than the video depicted to be credible, and I have considered it.  However, Trooper Sikes' report does not state this movement caused concern for his safety beyond his initial impression the occupants might be trying to flee.  Doc. 65-2 at 4.  And, even crediting Trooper Sikes' testimony on this point, the record demonstrates—at most—only slightly more movement than depicted on the dashcam.  Trooper Sikes' testimony does not suggest some extraordinary or unusual amount of movement inside the vehicle.  Moreover, though movement inside a vehicle may support reasonable suspicion as a general matter, the occupants' 45 seconds of minimal movement here, when coupled with other facts in this case, provides little to no support for reasonable suspicion.  Cf. United States v. Edwards, 307 F. App'x 340, 344–45 (11th Cir. 2009) (explaining the defendant's suspicious movements, where he appeared to be hiding something between the seats

of the car, and the officer's observation of what appeared to be a bag of marijuana in plain view between the front seats of the car provided the officer probable cause to arrest the defendant).

The Government argues Defendant's failure to comply with Trooper Sikes' initial order to exit the car provided Trooper Sikes with reasonable suspicion to believe other criminal activity was afoot.  Doc. 73 at 14.  Defendant argues the dashcam video forecloses any argument Defendant's alleged non-compliance was suspicious.  Doc. 85 at 12.  Specifically, Defendant believes the video demonstrates any purported non-compliance is based on her inability to hear Trooper Sikes' initial order, which is supported by her compliance once Trooper Sikes used hand gestures.  Id. (citing Doc. 65-1 at 2:04–2:16).  The dashcam video shows Trooper Sikes pulled over Defendant at a busy intersection on a highway and Trooper Sikes was positioned behind Defendant's car when he asked her to exit.  When Trooper Sikes asked Defendant to exit the car a second time, he used hand gestures to communicate his directions to Defendant.  The noise from passing traffic can be heard on the video and inevitably, that noise, and the distance between Defendant and Trooper Sikes, hindered her ability to hear his directives.  The video demonstrates any non-compliance by Defendant was minimal and fleeting.  Defendant struggled to hear Trooper Sikes' directives, and Defendant ultimately exited the car within 15 seconds after Trooper Sikes initially asked her to exit the car the first time and immediately after the second request, which was accompanied by hand gestures.  See Doc. 65-1 at 2:04–2:20.  I do not find the record demonstrates Defendant failed to comply with Trooper Sikes' instructions to exit her vehicle; instead, it demonstrates Defendant promptly and adequately complied, given the circumstances of the stop.

The Government argues Defendant had a "blank look" when exiting the car and this facial expression supports reasonable suspicion.  Doc. 73 at 14.  Like Defendant's alleged non-

compliance, the video shows Defendant engaged in conversation with Trooper Sikes and answering questions appropriately.  Doc. 65-1 at 2:23–5:00.  Moreover, the Government does not clarify what a "blank look" means and leaves the undersigned guessing as to what is suspicious about Defendant's demeanor.  Having reviewed the dashcam video, I find there is no evidence Defendant had any sort of unusual or suspicious "blank look" during her interactions with Trooper Sikes.  See Doc. 64-1 at 2:19–5:00 (showing Defendant engaged and answering Trooper Sikes' questions).  Moreover, case law again provides a calm demeanor does not provide reasonable suspicion.  See United States v. Heard, 725 F. App'x 743, 752–54 (11th Cir. 2018) (finding articulable reasonable suspicion did not exist at inception of Terry stop and vacating conviction where facts showed the defendant "remained calm, provided identification, and willingly answered questions," which cut against a finding of reasonable suspicion); United States v. Perkins, 348 F.3d 965, 971 (11th Cir. 2003) (requiring more than nervousness, repeating officer's questions, and out-of-state license to give rise to reasonable suspicion).

     Equally unpersuasive is the Government's argument Defendant's travel plans provided reasonable suspicion.  Doc. 73 at 14.  The Government characterizes Defendant's testimony about her travel plans as inconsistent.  Id.  But the record does not support that view.  When Trooper Sikes asked Defendant where she was traveling to, Defendant informed him she was going to Jacksonville.  Doc. 65-1 at 3:14–3:22.  She further explained the trip was prompted by cold weather in Atlanta and a desire to be somewhere warmer, like Jacksonville.  Id. at 3:27–3:40.  Another officer on the scene later commented everyone had consistent stories about going to Jacksonville.  Doc. 65-1 at 31:52.  Further, there is nothing inherently suspicious about taking a trip from Atlanta to Jacksonville to find warmer weather.  See Doc. 85 at 15–16 (asking the Court to take judicial notice of the fact Jacksonville is about five hours south of Atlanta, from

where Defendant traveled).  Lastly, even if traveling from Atlanta to Jacksonville for a warmer climate and to go to the beach were unusual, unusual travel plans on their own do not suggest criminal activity.  United States v. Boyce, 351 F.3d 1102, 1109 (11th Cir. 2003).

Finally, the Government argues Defendant's inability to identify the other passengers in the car provided reasonable suspicion.  Doc. 73 at 15.  Again, the video footage forecloses this argument.  When Trooper Sikes asked Defendant to identify the other passengers, she stated she was traveling with two of her friends and a friend-of-a-friend.  Doc. 65-1 at 4:24–4:37.  Trooper Sikes asked Defendant if she knew the other passengers' names, and she identified two of the passengers by nicknames and stated she did not remember the third passenger's name (i.e., the friend-of-a-friend).  Id.  Trooper Sikes asked no follow-up questions about the identity of the passengers or Defendant's familiarity with them.  I attach little significance to Defendant referring to her friends by nicknames and by failing to identify one passenger whom she stated she just met, when Defendant was not asked to do more.

Although I addressed each of the facts relied on by the Government individually, I have—as I must—considered the facts collectively, as the totality of the circumstances Trooper Sikes encountered on March 6, 2019.  Some of the alleged facts are simply not supported by the record (i.e., Defendant's failure to stop, failure to comply with Trooper Sikes' instruction to exit the vehicle, inconsistent travel plans, and a "blank look"), and the few that are (i.e., speeding, a rental car with out-of-state plates, some movement by the passengers, and identification of passengers by nicknames) provide, at most, a mere scintilla of suspicion when viewed in context. The facts supported by the record, even taken together, do not support anything more than an "inchoate hunch" that criminal activity other than speeding was afoot.  See, e.g., Tapia, 912 F.2d at 1371; see also Harris, 347 F. Supp. 3d at 1239–40 (finding no reasonable suspicion based on

prior drug arrest, nervousness, and presence in city with high crime rate); Perkins, 348 F.3d at 971 (finding no reasonable suspicion where defendant was nervous, had Florida driver's license despite claiming to live in Alabama, and his stated purpose for travel differed from statement of companion); Tapia, 912 F.2d at 1371 (finding no reasonable suspicion based merely on suspects being Mexican, having few pieces of luggage, being visibly nervous or shaken, traveling on interstate in Alabama with Texas license plates, and driving a car insured by a third party); cf. United States v. Bishop, 940 F.3d 1241, 1249–50 (11th Cir. 2019) (finding reasonable suspicion based on prior criminal history and nervousness when combined with agitation, defensiveness, refusal to comply with officer orders to exit car, and arrest of person earlier in day with heroin who was traveling to defendant's residence); United States v. Simms, 385 F.3d 1347, 1354–55 (11th Cir. 2004) (finding reasonable suspicion based on not just prior drug arrest and nervousness but also BOLO alert for defendant's vehicle because of suspected drug transportation and defendant's suspicious story "about going to the VA hospital in Texas instead of one closer to his home in West Palm Beach, Florida").

Because Trooper Sikes lacked reasonable suspicion to believe other criminal activity was afoot, he was not permitted to ask unrelated questions to investigate other criminal activity. Trooper Sikes' unrelated questioning impermissibly prolonged the stop, and thus, violated Defendant's Fourth Amendment rights.

## II.     Whether the Inevitable-Discovery Exception Precludes Exclusion of the Evidence

Normally, evidence obtained during the March 6, 2019 stop would be suppressed by virtue of the exclusionary rule due to Trooper Sikes' impermissible questioning. Campbell, 912 at 1355. However, in this case, the Government argues the inevitable-discovery exception to the exclusionary rule applies.

Under the exception for "inevitable discovery," the government may introduce evidence obtained by an unconstitutional search if it can establish a "reasonable probability that the evidence in question would have been discovered by lawful means." Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir. 2004); see also Utah v. Strieff, ___ U.S. ___, 136 S. Ct. 2056 (2016) ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source.") (citing Nix v. Williams, 467 U.S. 431 (1984)). For the doctrine to apply, the government must prove "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." Jefferson, 382 F.3d at 1296. Additionally, there must be a reasonable probability the evidence in question would have been discovered by those lawful means. United States v. Brookins, 614 F.2d 1037, 1042 n.2 (5th Cir. 1980). For the exception to apply, the Government must establish the requirements of the exception by a preponderance of the evidence. United States v. Virden, 488 F.3d 1317, 1322 (11th Cir. 2007). Thus, the inevitable-discovery exception requires a court to determine: (1) whether law enforcement were actively pursuing lawful means, and (2) whether there is a reasonable probability the evidence would have been discovered by those means.

Defendant argues the inevitable-discovery exception should not apply here, because Trooper Sikes was not actively pursuing lawful means. The Government disagrees. The "actively pursuing lawful means" requirement is addressed first. As to the second requirement, "reasonable probability," Defendant does not raise any specific challenge to that requirement, but I address it below for completeness. I also address whether applying the inevitable-discovery exception in this case is consistent with the purposes of that exception.

### A.    "Actively Pursuing Lawful Means"

The Government argues, even if there was a Rodriguez violation during the March 6, 2019 stop, the evidence obtained during the search should not be excluded because the facts in

this case support application of the inevitable-discovery exception.  Doc. 73 at 18; Doc. 119 at 19.  The Government points out Trooper Sikes learned very early in the stop Defendant's vehicle was a rental car and the rental agreement was in located in the glove box.  Doc. 73 at 18.  The Government argues, as a result, Trooper Sikes was permitted to approach the vehicle to obtain the rental agreement.  When he did, he smelled marijuana, which gave him probable cause to search the vehicle.  The Government contends regardless of any Rodriguez violations, Trooper Sikes was actively pursuing lawful means—investigating the rental agreement in conjunction with the stop for speeding—and there is a reasonable probability Trooper Sikes would have discovered the disputed evidence as a result of those lawful means.  Id.

Defendant, on the other hand, asserts the inevitable-discovery exception does not apply because Trooper Sikes committed Rodriguez violations and unlawfully prolonged the stop before he ever approached the vehicle and detected marijuana.  Doc. 85 at 21.  Therefore, Defendant contends Trooper Sikes was not actively pursuing lawful means before the occurrence of the Rodriguez violation, and so, the inevitable-discovery exception should not apply.  Id. at 22.

The parties' arguments center on the first requirement of the inevitable-discovery exception: whether Trooper was "actively pursuing lawful means" prior to committing any Rodriguez violations.  Jefferson, 382 F.3d at 1296.  The issue was raised in the parties' initial briefs, docs. 73, 85, at the hearing, and, at the Court's direction, in the parties' supplemental briefs, docs. 119, 120.  Having considered the parties' submissions and the Court's own independent research, it is clear there are very few published decisions even touching on the application of the inevitable-discovery exception (and, specifically, the "actively pursuing lawful means" requirement) in the context of Rodriguez violations.  The Court, therefore, begins with general principles related to the inevitable-discovery exception.

In <u>United States v. Johnson</u>, the Eleventh Circuit expounded on what "active pursuit" means in the inevitable-discovery context.  777 F.3d 1270, 1274 (11th Cir. 2015).  Active pursuit "does not require that police have already planned the particular search that would obtain the evidence.  The government must instead establish that the police would have discovered the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.'" <u>Id.</u> (citing <u>Virden</u>, 488 F.3d at 1323).

In <u>Johnson</u>, a police officer stopped a truck driven by the defendant, checked the truck's license plate, and determined the truck was registered to a deceased individual.  <u>Id.</u> at 1272.  The officer also discovered the defendant was driving with a suspended license.  <u>Id.</u> at 1273.  The officer then decided to arrest the defendant for driving with a suspended license; however, prior to arresting the defendant, the officer looked inside the truck and removed item wrapped in white cloth, which turned out to be a sawed-off shotgun.  <u>Id.</u>  The defendant was arrested and charged with possessing a firearm as a felon and knowingly possessing an unresisted firearm.  <u>Id.</u> Following the defendant's arrest, the officer completed a valid inventory search.  The Eleventh Circuit held because the officer's "investigation into the ownership" of the vehicle occurred before the unlawful discovery of the sawed-off shotgun, the search constituted "'active pursuit . . . of the evidence 'already in his possession.'"  <u>Id.</u> at 1275 (quoting <u>Jefferson</u>, 382 F.3d at 1296). That is, the officer's "investigation of the truck began before, and was independent of, his illegal search."  <u>Id.</u> at 1277 ("Because the truck was registered to a person who was deceased, [the defendant] was driving with a suspended license, and the truck could not be turned over to anyone else, [the officer] would have impounded the truck and discovered the shotgun through an inventory search.").  Applying <u>Johnson</u> in the context of a <u>Rodrigues</u> violation, the lawful

means must be pursued before and independent of the violation, but it is not required the lawful means must be continuously pursued or entirely uninterrupted by unconstitutional questioning.

In United States v. Virden, 488 F.3d 1317, 1322–23 (11th Cir. 2007), the Eleventh Circuit discussed the active pursuit requirement as well and explained, for the exception to apply, the government must show officers would have obtained the evidence "by virtue of ordinary investigations of evidence or leads already in their possession." Id. at 1323 (citing Brookins, 614 F.2d at 1048 (internal quotations omitted)). The Virden court declined to apply the inevitable-discovery exception in that case because the officers "decided to take an unlawful route to obtain the desired evidence because it was expedient, rather than determine an alternate lawful route." Id. at 1324. Specifically, the court concluded the officers were "engaged in no lawful investigatory actions which would have led to the search of Virden's car." Id. at 1323.

Applying these standards, I conclude Trooper Sikes was actively pursuing lawful means before committing any Rodriguez violation. At the outset of the stop, Trooper Sikes engaged in an "ordinary investigation" of the status of Defendant's vehicle. Namely, he determined Defendant was driving a rental car and that he needed to retrieve the rental agreement in order to finish writing the speeding ticket. Doc. 65-1 at 3:17–3:27. Trooper Sikes' question about the car's ownership and Defendant's statement it was a rental car occurred before any of the "impermissible questioning" challenged by Defendant. Specifically, between the 3:15 mark and 3:24 mark in the video, Trooper Sikes asked who owns the car, and Defendant stated the car was a rental, and Trooper Sikes stated he is going to obtain the rental agreement. Of the 18 questions Defendant challenged under Rodriguez, the first—asking about contraband in the car—did not occur until the 4:00 minute mark. Indeed, Defendant does not challenge any questions Trooper Sikes asked prior to the exchange about the car's ownership, and it appears all those questions

were permissible under Rodriguez.  Therefore, based on the record, Trooper Sikes' investigation of the rental agreement "began before, and was independent of," his unconstitutional prolongation of the stop.  Johnson, 777 F.3d at 1274.  As a result, Trooper Sikes was actively pursuing lawful means prior to any Rodriguez violation.[12]

The parties provided additional legal authority they contend aids in the Court's analysis. Defendant points to United States v. Gomez, 877 F.3d 76 (2d Cir. 2017).  In Gomez, the officer retrieved the defendant's registration but not his license when he stopped the defendant.  Id. at 91.  The officer then questioned the defendant about heroin, among other topics, unrelated to the traffic stop.  Id.  Following the questioning, the defendant gave consent to the officer to search his car, which uncovered 13,000 bags of heroin for sale.  Id. at 83–84.  The Second Circuit Court of Appeals found the officer violated Rodriguez when he questioned the defendant about heroin, but, even so, the evidence was not to be excluded due to application of the good-faith exception. Id. at 91–92.  Regarding consent, the court affirmed the trial court's ruling the defendant had consented to the search, despite the defendant's sworn testimony he did not.

Defendant argues Gomez (and Campbell) demonstrate the timing of Rodriguez violations is critical.  Doc. 120 at 6–7.  Defendant asserts the consent at issue in both Gomez and Campbell occurred after the Rodriguez violations, and, therefore, the defendant's consent in those cases was "immaterial" to assessing whether the evidence should be excluded.  Defendant argues this principle applies with equal force to Trooper Sikes' utilizing lawful means (i.e., approaching Defendant's vehicle to obtain the rental agreement) that occurred after he committed Rodriguez violations.

---

[12]      Whether the inevitable-discovery exception would apply in different circumstances—for example, where an officer initiates "lawful means" after committing a Rodriguez violation—is not before the Court and is not addressed in this Report.

There are a few problems with Defendant's argument.  First, in <u>Gomez</u>, the Second Circuit never said the defendant's post-violation consent was immaterial.  The court never needed to reach that issue because the evidence was shielded from exclusion by the good-faith exception.  Put differently, <u>Gomez</u> says nothing about whether consent can absolve a <u>Rodriguez</u> violation.[13]  Second, it is not clear post-violation consent should be treated the same as post-violation lawful means.  Third, and most importantly, Defendant relies on incorrect premise that Trooper Sikes' first attempt to use lawful means was when he approached Defendant's vehicle to obtain the rental agreement.  But Defendant's argument ignores the fact Trooper Sikes was actively pursuing lawful means earlier, when he first asked questions about ownership of the vehicle, which occurred before any <u>Rodriguez</u> violations.

The Government cites to several cases to support the proposition that even after <u>Rodriguez</u> the inevitable-discovery exception can still apply.  First, the Government's reliance on <u>United States v. Bah</u>, 794 F.3d 617 (6th Cir. 2015), is of limited help.  Doc. 120 at 23.  In <u>Bah</u>, the driver-defendant and passenger-defendant were pulled over for speeding.  <u>Bah</u>, 794 F.3d at 621.  The driver-defendant was driving a rental car with a suspended license and the passenger-defendant was not listed on the rental agreement.  <u>Id.</u> at 622.  The passenger-defendant challenged his pre-arrest questioning and detention based on <u>Rodriguez</u>.  However, the Sixth Circuit Court of Appeals rejected any <u>Rodriguez</u> challenge because the court found the officer had reasonable suspicion to question and detain the passenger-defendant.  <u>Id.</u> at 628–29.  Further,

---

[13]     The same is true for <u>Campbell</u>.  There, the Eleventh Circuit expressly declined to address "whether Campbell's consent purged the taint from the unlawfully prolonged seizure."  970 F.3d at 1360.  Even so, in a footnote, the court implied lawful consent given after a <u>Rodriguez</u> violation would "purge the taint" of the violation, assuming the consent was not obtained as a result of an illegal seizure.  <u>Id.</u> n.23; <u>but see</u> <u>United States v. Ward</u>, No. 16-cr-00485, 2017 WL 1549474, at *4 (N.D. Cal. May 1, 2017) (holding, based on specific facts of the case, consent did cure a <u>Rodriguez</u> violation by the officer and the inevitable-discovery exception did not apply).

though the Sixth Circuit did recognize even if the defendant had not been detained, the police would have performed an inventory search uncovering the same evidence, the specific facts of the case limit its helpfulness.  The <u>Bah</u> court stressed the legality of the inventory search was not being challenged as the passenger-defendant had no standing to challenge it.  <u>Id.</u> at 626.  Thus, the Sixth Circuit determined there were no <u>Rodriguez</u> violations, and the passenger-defendant had no standing to challenge inventory search.  Therefore, any observations about suppression of the evidence in that case are not instructive on the matters before this Court.

The Government also relies <u>United States v. Constanza</u>, No. 5:17-CR-49, 2018 WL 3015244 (M.D. Ga. June 15, 2018).  In <u>Constanza</u>, the court discussed whether a dog sniff violated <u>Rodriguez</u> and ultimately determined it did not.  <u>Id.</u> at *6.  Despite not finding a violation, the court discussed whether the contraband found during a later search would have been admissible under the inevitable-discovery exception, even if the search had been unconstitutional.  <u>Id.</u>  There, the court determined the officers actively pursued a lawful traffic stop and discovered the defendants were not licensed to drive the vehicle.  <u>Id.</u>  After discovering this, one of the officers testified when there is no licensed driver, department policy required the officers impound the vehicle after an inventory search.  <u>Id.</u>  Thus, the inventory search, not the dog sniff, would have inevitably led to the discovery of the contraband.  <u>Id.</u>

The decision in <u>Constanza</u> demonstrates the inevitable-discovery exception should apply even following <u>Rodriguez</u> violations, like the ones in this case.  In <u>Constanza</u>, the facts that would have led to an inventory search—the unlicensed drivers—were discovered prior to any allegations of unconstitutional conduct.  The same temporal sequence exists here—Trooper Sikes learned Defendant was driving a rental vehicle prior to, and not as a result of, any <u>Rodriguez</u> violation.  Likewise, in <u>United States v. Ward</u>, the court assumed the inevitable-discovery

exception would apply following a <u>Rodriguez</u> violation but determined the doctrine did not apply to the specific facts presented—namely, that it was "'unrealistic' as a factual matter" the evidence would have discovered inevitably by lawful means.  Case No, 16-cr-00485, 2017 WL 1549474, at *4 (N.D. Cal. May 1, 2017).  Ultimately, the limited cases identified all support the conclusion the inevitable-discovery exception can and should be applied, even in the context of a <u>Rodriguez</u> violation, where the requirements of the exception are satisfied.  Indeed, I have not identified any decision suggesting the inevitable-discovery exception categorically does not apply in the context of a <u>Rodriguez</u> violation or should not be applied based on the facts before the Court.

In sum, Trooper Sikes was in active pursuit of lawful means prior to any constitutional violation.  Trooper Sikes credibly testified he became aware the car was a rental prior to any unconstitutional questioning and once he learned the car was a rental, he would have always retrieved the rental agreement when issuing the citation for speeding.

### B. "Reasonable Probability"

As noted above, for the inevitable-discovery exception to apply, there must be a reasonable probability the evidence in question would have been discovered by the lawful means officers were actively pursuing prior to the unlawful conduct.  <u>United States v. Brookins</u>, 614 F.2d 1037, 1042 n.2 (5th Cir. 1980).  Defendant does not raise a specific challenge to this requirement, but I address it for completeness.

Trooper Sikes testified that in order to write the speeding ticket, he would always retrieve the rental agreement from the car's glove box.  He also testified he would have never allowed Defendant to retrieve the paperwork herself.  Therefore, Trooper Sikes would have always returned to the car and detected marijuana, thus giving him probable cause to search it.  Trooper Sikes' testified in these circumstances—learning that a car he stopped for speeding was a rental

vehicle—he would always retrieve the rental agreement to finish writing the ticket.  I find this testimony to be credible.  Moreover, Defendant has presented no evidence or argument to contradict this testimony or to undermine Trooper Sikes' testimony on this point.  Further, Trooper Sikes did, in fact, obtain the rental agreement from Defendant's vehicle early in the stop, and when he did, the record demonstrates (and it is undisputed) Trooper Sikes smelled marijuana.  The law is clear that once an officer smells marijuana during a traffic stop, the officer has probable cause to search the vehicle.[14]  See e.g., United States v. Flippo, 759 F. App'x 907, 909 (11th Cir. 2019) (finding the odor of marijuana provides probable cause for warrantless search).  Trooper Sikes did search the vehicle following his detection of marijuana, and that search revealed the disputed evidence.  Therefore, I find the record establishes there was a "reasonable probability" the evidence in question would have been discovered as a result of lawful means.

**C.    Application of the Inevitable-Discovery Exception is Consistent With the Exception's Purpose**

The purpose of the inevitable-discovery exception, as outlined by the Eleventh Circuit, also supports applying the exception in this case.  The Eleventh Circuit explained the inevitable-discovery exception is designed to avoid putting the government in a "worse position than had the police misconduct not occurred."  Johnson, 777 F.3d at 1275 (quoting Virden, 488 F.3d at 1322); see also Nix, 467 U.S. at 443 (explaining "interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse position [than] they would have been in if no police error or misconduct had occurred").  Moreover, "the purpose of the

_____

[14]     As noted previously, Defendant does not dispute Trooper Sikes had probable cause to search Defendant's vehicle once he detected the odor of marijuana.

requirement of active pursuit is to exclude evidence that was not being sought in any fashion." Johnson, 777 F.3d at 1275.  As the Eleventh Circuit has more recently put it, "[E]xcluding evidence where it would have been discovered anyway 'would not restore the parties to their previous positions and would upset the careful weighing of competing interests underlying the exclusionary rule.'"  United States v. Watkins, 981 F.3d 1224, 1232–33 (11th Cir. 2020) (citing Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir. 2004)).

Applying the inevitable-discovery exception in this case is consistent with purposes and rationale underpinning the doctrine.  The doctrine is intended to put the police in the same, not a worse position they would have been in if no police error or misconduct had occurred.  Nix, 467 U.S. at 434.  Had Trooper Sikes done everything right, making no mistakes and complying fully with the Fourth Amendment, he would have stopped Defendant just as he did, he would have approached the passenger side of the car to retrieve the rental agreement just as he did, he would have detected marijuana just as he did, and the evidence would have been discovered and seized just as it was.  See Jefferson, 382 F.3d at 1297 ("Subtract the [illegal search] from the factual picture in this case" and "nothing of substance . . . would have changed."); United States v. Wilson, No. 4:13cr102, 2015 WL 5923558 (N.D. Fla. Oct. 12, 2015) (finding the inevitable-discovery exception applies where the evidence would have been discovered had the officer issued the correct traffic citation).  The only difference would have been the impermissible questioning; Trooper Sikes would not have spent about 65 seconds asking Defendant questions unrelated to speeding.  Without Trooper Sikes' unconstitutional detour, he still would have approached the car to obtain the rental agreement, detected marijuana, searched the car, and discovered the false identification documents and other contraband.  To exclude the evidence now would put the Government in a worse position, which is a result contrary to binding

precedent.  Watkins, 981 F.3d at 1232–33; Johnson, 777 F.2d at 1277; Virden, 488 F.3d at 1322.

Accordingly, the evidence should not be excluded if Trooper Sikes' detection of marijuana

provided sufficient justification to search the car.

Furthermore, the police misconduct is not so egregious that the exclusionary rule's

deterrence rationale overwhelms the policy goals of the inevitable-discovery exception.  The fact

the stop was prolonged for only a short amount of time has no bearing on whether Defendant's

constitutional rights were violated, but the severity of the police misconduct is an appropriate

consideration when balancing deterring misconduct with ensuring that "obviously guilty

persons" do not go unpunished.  Jefferson, 382 F.3d 1286 (citing Nix, 467 U.S. at 443).  Indeed,

the "careful weighing of competing interests underlying the exclusionary rule" may counsel in

favor of exclusion.  Id. (citing Nix, 467 U.S. at 444).  Here, the constitutional violations were

brief, isolated, and not the product of any obvious animus or reckless overreach by law

enforcement officers.  By contrast, many Rodriguez violations present much more egregious

circumstances.  See e.g., United States v. Cole, No. 20-2105, 2021 WL 1437201, at *1 (7th Cir.

Apr. 16, 2021) (prolonging a pretextual traffic stop by several minutes and requiring the

defendant to drive to another location in order to facilitate a dog sniff).  In short, the

circumstances of the violations here, and the relevant competing interests, do not weigh in favor

of exclusion.

Defendant's counsel suggested at oral argument application of the inevitable-discovery

exception in the context of a Rodriguez violation would overwhelm Rodriguez's protections.

Although exceptions do, occasionally, consume the rule, that is not a risk here.  For the

inevitable-discovery exception to apply in a case, the prosecution must demonstrate officers were

actively pursuing lawful means and there was a reasonable probability the disputed evidence

would have been discovered.  Careful consideration of these requirements mitigates knee-jerk application of the doctrine in the context of every <u>Rodriguez</u> violation.  These requirements ensure officers who have deviated into unconstitutional territory by asking impermissible questions during a stop cannot simply get "back on track" by artificially creating "lawful means" later in the same stop.  Moreover, there is no indication in any controlling authority the inevitable-discovery exception cannot, or should not, be applied (where appropriate) in the context of a <u>Rodriguez</u> violation.  Indeed, courts considering similar issues have recognized the inevitable-discovery exception may be applied in the context of a <u>Rodriguez</u> violation.  <u>See e.g.</u>, <u>United States v. Robertson</u>, 2020 WL 3574368, at *11–12 (W.D. Pa. June 29, 2020); <u>United States v. Mahone</u>, 179 F. Supp. 3d 760, 765–66 (E.D. Mich. 2016).

In sum, it is appropriate to apply the inevitable-discovery exception in the context of a <u>Rodriguez</u> violation, and the record supports application of the doctrine in this case.  I find the Government has shown by a preponderance of evidence Trooper Sikes was actively pursuing lawful means before committing any <u>Rodriguez</u> violation and there is a reasonable probability the evidence at issue in this case would have been discovered as a result of those means.  While the disputed evidence seized during the March 6, 2019 traffic stop would otherwise be excluded under <u>Rodriguez</u>, application of the inevitable-discovery exception permits the admission of the disputed evidence.

**III.   Whether Trooper Sikes Unconstitutionally Prolonged the Stop After Detecting the Odor of Marijuana**

Lastly, Defendant argues even after Trooper Sikes smelled marijuana inside the car, he should not have been permitted to detain and question Defendant and the car's passengers and search the car for the length of time he did.  Doc. 65 at 22–23.  That is, Defendant argues even after detecting marijuana, the stop was impermissibly long and unconstitutional.

First, Defendant does not dispute Trooper Sikes' detection of marijuana provides probable cause to support further detention or a search.  Moreover, Circuit precedent provides smelling marijuana during a traffic stop has satisfied even the higher "probable cause" standard. United States v. Lueck, 678 F.2d 895, 903 (11th Cir. 1982), *abrogation on other grounds recognized by* United States v. Phillips, 812 F.2d 1355 (11th Cir. 1987) (noting it is "clearly established that the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search"); Flippo, 759 F. App'x at 909 (finding the odor of marijuana provides probable cause for warrantless search); United States v. Tobin, 923 F.2d at 1512 (11th Cir. 1991) (same); United States v. Cartwright, 183 F. Supp. 3d 1348, 1355 (M.D. Ga. 2016) (same).

Here, the record plainly demonstrates Trooper Sikes smelled marijuana emanating from Defendant's car when he first approached it, and Defendant does not dispute this fact.  Indeed, Trooper Sikes states on the dashcam footage he smelled marijuana and officers ultimately recovered marijuana from the car during the search.  Because Trooper Sikes smelled marijuana, he was permitted to extend the traffic stop and broaden the scope of inquiry to investigate the presence of marijuana.  See Campbell 912 F.3d at 1353 (citing Rodriguez 575 U.S. at 354) (finding "a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes).

While Defendant argues Trooper Sikes should have acted more expeditiously after detecting marijuana, Defendant fails to cite any case law in support of her proposition.  After Trooper Sikes detected marijuana, he spent several minutes questioning Defendant about it and then processed the passengers' IDs, as well as Defendant's speeding ticket.  During this time, Trooper Sikes also had Trooper McCrary radio in for a female officer to search Defendant and Laing, as well as a canine unit.  Most of the delay in performing any search is a result of waiting

for the female officer and drug dog to arrive; it took 9 minutes for a female officer to arrive and almost 30 minutes for a drug dog to arrive.  While waiting, Trooper Sikes also continued to try and verify the identity of the car's passengers.  Any delay in continuing to search Defendant and investigate marijuana does not constitute a violation of Defendant's right.  Instead, most of the delay arose from reasonable investigatory efforts, namely waiting for a female officer and a drug dog.  A delay for these reasons does not violate Defendant's constitutional rights.  See, e.g., United States v. Barnes, CR 120-052, 2020 WL 7391294, *4 (S.D. Ga. Nov. 25, 2020) (citing United Sates v. Anguiano, 791 F. App'x 841, 849 (11th Cir. 2019)) (finding as reasonable officer's decision to await backup before searching vehicle).

In sum, Trooper Sikes had probable cause to search the vehicle once he smelled marijuana, and Defendant has not shown any constitutional violation occurred after Sikes detected marijuana.  Accordingly, this portion of Defendant's Motion to Suppress should be denied.

**CONCLUSION**

Based on the foregoing, I **RECOMMEND** the Court **DENY** Defendant's Motion to Suppress and allow the Government to use all information and evidence obtained as a result of the search as appropriate.

Any objections to this Report and Recommendation shall be filed within 14 days of today's date.  Objections shall be specific and in writing.  Failure to file timely, written objections will bar any later challenge or review of the Magistrate Judge's factual findings and legal conclusions.  28 U.S.C. § 636(b)(1)(C); Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1192–93 (11th Cir. 2020).  To be clear, a party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions on appeal by failing to file timely,

written objections.  <u>Harrigan</u>, 977 F.3d at 1192–93; 11th Cir. R. 3-1.  A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not meeting the specificity requirement set out above will not be considered by a District Judge.  A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a District Judge.

**SO REPORTED and RECOMMENDED**, this 12th day of May, 2021.


_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA